B.S. D'Antoni Company, formerly a corporation, was engaged in the stock and bond brokerage business in New Orleans. The corporation, since the filing of this suit, has been liquidated and it is agreed that under the same name, B.S. D'Antoni and Erwin Schweickhardt have formed a partnership for conducting the same kind of business and that any judgment which may be rendered in this case should be rendered either for or against the said partnership.
The Louisiana Mutual Aid Fire Indemnity Insurance Society, Inc., is an organization doing business under the laws of Louisiana, and its affairs are governed and controlled by a Board of Directors.
D'Antoni Company brought this suit against the said society claiming $270 as the loss caused by the failure of defendant corporation to consummate a trade in bonds which, plaintiff alleges, defendant agreed to make with it.
Defendant admits that there were preliminary negotiations looking to the trade but denies that any agreement was ever reached, and consequently denies that there was any breach of contract on its part.
The record shows that Mr. D'Antoni, President of B.S. D'Antoni Company, had, on several occasions prior to the one in question, purchased and sold securities for the defendant Insurance Society and that, on some occasions, he had acted as broker and, on others, he had acted as principal, buying or selling from or to the Insurance Society for the account of his corporation and not as agent or broker for the Insurance Society. D'Antoni was familiar with the fact that the defendant Insurance Society owned fifteen Louisiana Highway bonds of the face value of $1,000 each, and he believed that because of market conditions it would be advisable for the corporation to sell these bonds and, in their place, to buy fifteen bonds of the Orleans Levee Board of the face value of $1,000 each. Accordingly, on July 22, 1941, D'Antoni telephoned to the office of defendant to suggest that it make this trade; that it sell its Highway Bonds to him at 104, and that he sell to it fifteen Levee Bonds at 95.
Mr. Louis Menendez, the President of defendant society, was not in, and Mr. D'Antoni spoke to Mr. Muller, the Secretary, who stated that he would have Mr. Menendez call Mr. D'Antoni.
On the next morning, Mr. D'Antoni made the same offer to Mr. Menendez, stating that he would buy the Highway Bonds at *Page 120 
104 and that he would sell the Levee Bonds at 95. Apparently, Mr. Menendez was perfectly willing to buy the Levee Bonds at 95 but he said that another broker, Mr. John Dane, had offered 104.50 for the Highway Bonds, and he said to D'Antoni that he would like very much to favor him with the business but that he could not do so unless D'Antoni would raise his offer for the Highway Bonds to 104.50. D'Antoni said that he could not do so. Only a few minutes later, however, he called Mr. Menendez again and told him that he would raise his offer to 104.50.
Up to this point there is no important disagreement between D'Antoni and Menendez but the entire controversy hinges upon which of the two gives the correct version of the next step in the negotiations. Menendez states that when D'Antoni called him and said that he would raise his offer to 104.50, his answer was that in the meantime the other broker had raised the bid to 105.92, and that D'Antoni could not buy the bonds unless he would meet this higher price.
D'Antoni's version is that when he said to Menendez that he would raise his bid to 104.50 to meet the competitive bid, Menendez accepted it. If Menendez accepted this offer, then there was a contract. On the other hand, if he did not accept it and told D'Antoni that he could buy the Highway Bonds only by raising his price to 105.92, there was no contract. D'Antoni admits that he at no time offered that price.
There are facts which seem to us to corroborate the testimony of D'Antoni, and most important of these facts is the testimony of Mr. Hattier of White, Dunbar Company, another brokerage firm, who testified that D'Antoni had arranged to purchase from his firm the Levee Bonds which he was attempting to sell to defendant. The record shows that Levee Bonds of that particular issue were rather scarce and that it was at first believed that if the fifteen bonds which were held by this other firm, White, Dunbar Company, could not be obtained by D'Antoni, he could not complete his contemplated trade because of inability to sell to defendant Society the fifteen Levee Board Bonds at 95 and that, therefore, D'Antoni was negotiating with White, Dunbar Company to obtain those bonds and that the price, 95, was satisfactory but, just at that time, John Dane had secured the bonds on option because he was attempting to make the identical trade with defendant which plaintiff was attempting to make, and Dane desired to use the same bonds so that he might sell them to defendant at 95.
When D'Antoni discovered that these fifteen Levee Bonds which he thought he would be able to buy from White, Dunbar Company had been taken out by Dane on option, he realized that he could not complete the deal if Dane retained the bonds, and he therefore called Mr. Menendez and asked him to notify Mr. Dane that Mr. Menendez's company was no longer interested in those Levee Bonds so that Dane would not exercise his option, and would thus make them available to D'Antoni. It seems that Dane did not release his option but Mr. Hattier of White, Dunbar Company testified that he was able to find fifteen other bonds, and that D'Antoni agreed to buy them at 95 so that he might sell them to defendant society at the same price and thus complete the trade which D'Antoni says he completed, and for the breach of which this suit was brought.
It is quite evident that if D'Antoni had not believed that he had closed negotiations with Menendez, he would not have agreed to purchase the fifteen Levee Board Bonds from Mr. Hattier, and we think the record shows conclusively that he did agree to buy these bonds from Hattier.
In view of this corroborating circumstance and because of the finding of the trial court, we conclude that the judgment appealed from should not be reversed.
There are other facts to which defendant points and other defenses made which must be considered, however.
Counsel for defendant vehemently contends that the fact that D'Antoni did not issue the usual confirmations proves conclusively that he did not believe that the trade had been accepted by Mr. Menendez, and it is true that the law of Louisiana requires that these confirmations be issued whenever a trade in securities is consummated. But Mr. D'Antoni states that when he called Mr. Menendez to tell him that he had been able to obtain Levee Bonds, Mr. Menendez immediately told him that he had already closed the entire transaction with Mr. Dane and that he, D'Antoni, should go no further. D'Antoni says that in view of this statement, he saw that it would be useless to issue confirmations and that he said to Menendez that they would have to settle the matter in court. *Page 121 
This is a satisfactory explanation. No useful purpose could have been served by the issuance of confirmations for a trade which had been denied by the other party.
On behalf of defendant, it is also contended that even if Menendez made the contract which D'Antoni says he made, he had no authority to do so and could only have done so if authorized by the Board of Directors.
The record shows beyond any question that on various occasions Mr. Menendez had made purchases and sales and had reported his actions to his Board for confirmation only after they had been completed. This is shown so conclusively by the record that we need not discuss it further.
Counsel for defendant also point out that in plaintiff's petition there appears an allegation which is admitted to be untrue. Plaintiff alleged that it had paid to White, Dunbar 
Company $75 because of its failure to complete its purchase of the Levee Bonds, and that that $75 constituted a part of this loss, whereas, as a matter of fact, the $75 has never been paid and White, Dunbar Company have conceded that they are not asking that it be paid.
The record shows that at the time the suit was filed White, Dunbar Company had contended that D'Antoni must pay them $75 to obtain a release from his contract to buy the Levee Bonds but that that company later realized that D'Antoni could not use the bonds and that since that company had sustained no loss in the transaction, it had decided not to attempt to hold D'Antoni liable. But, at the time the allegation was made, D'Antoni believed that he was liable for $75 and would be required to pay it, and, therefore, asked for reimbursement.
There is one additional point which is raised by counsel for defendant, and that is that certain evidence was improperly excluded. When Mr. Hattier was on the witness stand he was asked whether his company had made any claim against D'Antoni when D'Antoni found it impossible to go through with his negotiations with that company because of defendant's failure to carry out its contract with D'Antoni, and, on objection, the trial court did not permit Mr. Hattier to answer this question. We do not see that the question was an important one since Mr. D'Antoni admitted that, as a matter of fact, though claim had originally been made against him, it had been cancelled and he had not been called upon to pay White, Dunbar Company anything at all as a result of the cancellation. It may be that the answer to the question would have, to some slight extent, affected the creditability of Mr. D'Antoni but we think it would have been of such slight importance that it would not be proper to remand the case in order that this unimportant evidence might be introduced.
The same may be said of another objection to testimony which was sustained and, as a result of which, certain testimony was excluded. Mr. Hattier was asked whether or not he considered it ethical on the part of D'Antoni to attempt to have Mr. Menendez telephone Mr. Dane that his company was no longer interested in the purchase of Levee Bonds when, as a matter of fact, his company was still interested, and did wish to buy the bonds but wished to buy them through D'Antoni instead of Dane. The witness, Hattier, was not permitted to answer the question. This, again, seems to us to have only very slight importance. Whether or not Mr. Hattier considered that such a request of D'Antoni was unethical does not appear to us to be of sufficient importance to require that the matter be remanded in order that that question be answered.
The record, as a whole, convinces us that Mr. D'Antoni and Mr. Menendez reached an agreement as a result of which Mr. Menendez's company was to sell to Mr. D'Antoni fifteen Highway Bonds at 104.50, and was to buy from Mr. D'Antoni fifteen Levee Bonds at 95, and that defendant Society did not carry out its contract.
The record shows that D'Antoni had agreed to sell the Highway Bonds which he expected to purchase from defendant and that the price which he would have obtained was 105.80. So that he would have sold the fifteen bonds at a price exceeding by $13 each, the price which he would have paid defendant for them. He would have made a profit of $13 each on fifteen bonds. Thus there was a loss of $195, which was the amount for which he obtained judgment below.
It is ordered, adjudged and decreed that the judgment appealed from be, and it is, affirmed at the cost of appellant.
Affirmed. *Page 122